Good morning, ladies and gentlemen. As you can see, we are joined by our presiding judge, Judge Kleinfeld, via video from Fairbanks, where I assume it's still below zero. Is that true, Judge Kleinfeld? It's supposed to warm up to zero today, but the wind is awfully strong. And I'll turn it over to Judge Kleinfeld for any opening remarks he'd like to make on this session. Thank you. Thank you very much. I would like to apologize to you for my not being there today and for the inconvenience you've had with the changes. And I was all ready for the trip. And then I found myself in the emergency room on Friday. And they let me out to do this, but they won't let me travel for a couple of weeks. So I'm doing it from Fairbanks and you probably have a 60 or 80 degree temperature advantage over us. Enjoy it. Well, thanks. And no apologies are necessary, Judge Kleinfeld. We appreciate your willingness to appear by video. And and as always, you've it's inconvenient to you to have to do it this week. And we appreciate you doing it as well. We can see it quite clearly by video. So I don't think anybody has lost anything. And with that, I'd like to I'd like to on behalf of Judge Kleinfeld to welcome Judge Ron Layton from the Western District of Washington as a visiting judge. We sat with Judge Layton yesterday and he sat a number of times with with us. And we sure appreciate you taking time out of your busy schedule to help us out on the Court of Appeals. Happy to be here. With that, we'll hear your argument in the case scheduled for oral argument this morning. Miller versus State of California. Justices. Good morning. My name is Randy Andrus. I'm pleased to represent the appellant Michael Miller in this matter, which comes from the Eastern District of California in Sacramento. Mr. Miller, this case essentially is about Mr. Miller's employment rights that he had while he was to have been employed with the state of California, specifically the governor's office, criminal justice planning division. And unfortunately, in this particular case, Mr. Miller, who was a good employee. I mean, he had nothing negative on his record. He had certain reinstatement rights that he had with his employment, did participate in a certain investigation involving some discrimination with coworkers. He provided some testimony and witness interviews in that capacity. And for counsel, where is the counsel? Yes. Where is the evidence in the record that the people involved in his rehire knew anything about whatever participation he may have had in other workers? Title seven claims. Let me address that because that was the very point. I think the district court granted the motion for summary judgment saying that where where's the evidence that these individuals. That's right. That's right. And I just want to look at it in the excerpts. Okay. The evidence specifically comes in Mr. Miller's declaration, and that's in the excerpts of record filed on his behalf, specifically on page 24 and 25. I thought it was on 33. He says they were both aware of me. How would he know that? He doesn't quote a remark as far as I can tell, showing that they were aware. And you need personal knowledge in order to satisfy 56 C and E. Yes. He has personal knowledge of his contacts with the executive director, who at the time was Mr. Grimes. Well, he has to have person if it's his declaration you're relying on. He has to have personal knowledge of some evidence of what was in their heads. Now, what comes out of people's mouths gives you a lot of personal knowledge of what's in their heads. Where does he say anything that shows that he knew that they knew that he was involved in somebody else's Title VII claim? On page 24, lines 26 through 28. That's what I was looking at. He says they were both aware of me. How do I how does he know that they were aware of him in his statements? Of me and my statements. Yeah, but how does he know that? Based on his contacts with him, Mr. Grimes. I have contact with my wife every day, and I'm not aware of what she's aware of unless she tells me. Except when it's something obvious and I can sense it. I'm not sure the standard is that he would have to prove the negative. Except that they all submitted declarations saying affirmatively that they didn't know anything about his participation in the grievance procedures for which he alleges retaliation. Precisely. So they say we affirmatively did not know. And so what tells us in this record that creates a tribal issue of fact that they did know? Well, that sets up, I guess, the dispute. He says the light was green. They say the light was red. But doesn't he have to have some basis for say, for example, if he said, and I looked all over the record to see if he had ever told Sawyer or Levy or someone that he had testified on behalf of Turan or Ball. And there was no indication of that. He said we were in the in the same office. Now, I'm not sure if that's tantamount to saying we both worked in the Pentagon. Therefore, he must have known what I had done in regard. I mean, how big is the office and so forth? Because these people didn't claim to not even knowing before 2004, let alone know of his participation in the in the two grievances. Well, I think it later came out that they did know. And in the arbitration proceeding that was held, it was determined that was some of the basis that was relied on by the arbitrator that Mr. Levy, for example, did know and did have the pretext. So whether Mr. Miller. Where is that? Where is that in the record? Where is that? That is in the arbitration decision, which begins page 58. And in that opinion, in that arbitration decision, the arbitrator found that the based on the evidence that it was pretextual in what they did. Oh, trying to find the knowledge is what we're all asking you about. Just tell us where to look. It doesn't say anything in here about the complaints of Ball and Torin, does it? Am I missing? I don't know. I'm trying to. I thought I saw the language. I can't put my finger on it right now. The problem with the lightest green light is red thing is everybody's looking at the light. You can see with your own eyes whether it's red or green. So if you're paying attention and you disagree, somebody is lying. The more likely possibility is at least one of them is not paying attention. But that's something where personal knowledge is obvious. Here it isn't. Well, I think from the totality of the evidence that we have here, the link has been made that it's undisputed that Mr. Miller participated in these interviews and in the investigation. It's undisputed that he was later terminated. It's undisputed that there was an arbitration decision. The problem that I have with the district court's decision, even if they buy that, where is the evidence that Mr. Miller simply caught words coming admissions coming out of Mr. Look, here's the thing. Suppose you have an office, even a small office, half dozen people, and one employee is goading another one to make some sort of trouble for the boss. The boss is likely not to know, maybe never to know, who talked the employee into making trouble for him or that anyone talked the employee into making trouble for him, because the person who did it is probably trying to keep it secret. But sometimes the boss knows. And if the boss knows, I want to see the evidence in the record. In this case, the boss, the executive director, did know, and Mr. Grimes was aware, and he indicated that the matter would be corrected. So if it rolls downhill from the executive director and he knows, and then not only that, but you see the problem I have with the district court's decision is it says, okay, well, it limits that evidence and it limits in its context. It does not then also look at the other layers of discrimination and the other context that there is proof for. Right. But you have to have the first link, which is that you have to have knowledge of the act in order to retaliate because of it. And there's multiple acts, you see. But you're claiming act of retaliation for his testimony in the grievance proceedings of these other employees. That's what your claim is. It's not totally, and that's where I think the misconception by the district court is wrong. It wanted to limit it just to that wrongdoing and the termination. Our case shows that not only was there that conduct, and, okay, we'll put an asterisk by whether or not there was verbs coming out of mouths, but then we have certain, then we, after that, we have the termination. After that, we have the arbitration proceeding. After that, even, we have the conduct of the state knowing. If they didn't know maybe back before the termination, they certainly knew at the termination. They certainly knew in the interview. They certainly knew at the arbitration proceeding. And they certainly knew, based on the dynamics of what happened after that, that this man, Mr. Miller, had engaged in lawful activity and that he was asserting that he was retaliated against. And given those multiple acts, not just the one act alone of the retaliation and the termination, but the multiple acts along the continuum give rise to the body of evidence that justifies tribal issues of fact. And that's where the district court went awry. It was myopic in just limiting its opinion decision to just determination and whether these individuals coworkers. Counsel, am I right in recalling that in his grievance proceeding that was litigated to a conclusion in front of the arbitrator, he never even mentioned any of this Title VII stuff? No. I think that he did mention it. The discussion came up the Title VII was a discrimination-type right, and that right was not adjudicated, per se, in that proceeding. Did he grieve? Was part of his grievance that he was retaliated against because he helped somebody else's Title VII case? Yes. Okay. Where's that? That was the basis for his he was challenging. I want to see the words in the excerpts. Page Appellant's Excerpts of Records, page 59. The first paragraph indicates that the union alleged that the Office of Criminal Justice Planning failed to appoint Miller and Evelyn to permanent positions in retaliation for engaging in protected activity. Yeah, but the protected activity that was grieved wasn't race discrimination. It was not automatically it was him saying to the other employees they ought to automatically consider us for permanent positions instead of making us reapply. Yes, it was that permanent right that was grieved and that was adjudicated. That's not race discrimination. Correct. And the race discrimination right is what we're litigating in this case that he filed a EEOC action on, obtained a right to sue letter, and filed this action in district court for that right. That discrimination right was not the right that was being adjudicated in the arbitration. That's what I asked. Yes. And so, however, out of that arbitration proceeding, nevertheless, certainly the defendant, the appellee at this point knew of the discrimination rights and what Mr. Miller had done, and it's the conduct and the multiple acts after that point in time also that give rise to this claim and the discrimination based on the EEOC complaint and then the second one. Isn't the protected activity an issue in the Federal court action? The alleged retaliation for testifying on behalf of Ball and Turan in their Title VII grievances. In part. We're all still. Why only in part? I thought that was the alpha and the omega when it came to the protected activity. No, that's just the alpha. The omega comes later. And the omega comes with a second grievance before the EEOC, the Equal Opportunity Commission, complaining of additional discriminatory conduct, and he filed that with the EEOC on October the 4th, 2002. It wasn't the reason alleged for the retaliation, for the discriminatory conduct. Didn't it all relate back to the allegation that they knew I testified for Ball and Turan and they're getting back at me. It stemmed out of that, but it was a continuing, and that's my point here. Yes, but you didn't plead that. You only pled in this case, as far as I can tell, and you can correct me, that he was discriminated against based on the protected activity, namely his testimony on behalf of those other two employees. I don't think that's correct because on page 53 is the second charge of discrimination that was filed with the EEOC, which I believe was, had been filed and had a right to see that or had been issued, and that was made part of the complaint that was later filed in September of 2003. So we have two EEOC complaints. Okay. Here's what you say in paragraph 14. Plaintiff is statutorily protected. He was protected in questioning state's activities, complaining and testifying on behalf of others who were subjected to harassment and retaliation. After doing so, he was then retaliated against, discharged and further retaliated against, harassed and stonewalled, all in violation of his rights and a direct result of his protected activity. That's what the case is about, as far as I can tell. Now, maybe it morphed into something else. I don't know that. But that's what your complaint says. That's part of the basis of it. But by the time the complaint was filed in the district court, there were two EEOC complaints filed. Yes, I take it. I accept you on that, but I'm just saying that this other complaint you're talking about isn't referenced in your complaint. So I don't know how it's before us. I do want to reserve the top four minutes. Okay. Counsel, I do have one more question I'd like to ask you. If we get to this issue, if I remember the record correctly, and I may not, they did offer him a position back in accord with the arbitrator's decision, and he didn't show up. And he didn't show up repeatedly. I think they offered it five times or something like that. And he said, I'm not settling this until you pay me a million and a half dollars. Is that right? That's the way the appellant would have it sound. The truth of the matter is that they waited ten months after the arbitrator said to immediately reinstating. Not only that. I don't think the arbitrator said that. The arbitrator said to give him the next available position. They didn't. There was a hiring freeze, a statewide hiring freeze. And the question was, would they seek a waiver from the freeze, the statewide hiring freeze? Precisely. And they said, yeah, we will. And then they went back and forth, and he wanted a million and a half dollars. Well, that was the pretext.  And then they offered him the job anyway. They got a waiver. They did not offer him. Without a settlement. And he didn't show up. Is that true? No, that's not true. They did not offer him a bona fide position. Okay. They offered him a bogus position, delayed the matter, hired three other people. What does bogus mean? It means that it wasn't a permanent position, like it had been ordered to have. They offered him a position that they knew was going to be evaporated with the dismantling of the governor's office criminal justice planning department. So it was not a bona fide offer. And that's our point, that that act, with that kind of intent, denied my client his rights to permanent employment. It had been done. And certainly when they did that, and they engaged in that kind of conduct, they knew the history of this, and they certainly knew of his participation all along the way in the investigation, but yet they still delayed the matter. And then when he tried to find out the reason. Does the record show that that position was bogus in the sense that the offerors knew that it would soon evaporate because the office would be closed? I think that Mr. Miller has stated that in his declaration, that that's exactly what was happening. And why they waited 10 months. Did he have personal knowledge? Yes. And why they waited 10 months, hired three other people. Did the office close? Yes. But they waited three months, hired other people, and then pulled it out, gave him a bogus offer that would have evaporated, put him into not a permanent position, but a limited one, and then claimed that he was not showing up. Went all along. He wanted to know what the number was, because with a number with the state system, that would indicate to him whether it was a bona fide position, and they gave him the runaround. And that's further of this continuum. That's the omega. Wasn't his old position in that division that would close? His old position may have closed, but the right of permanent employment would have allowed him to laterally transfer to other positions in the state system. And that cut him off. He was cut off because of the conduct. I thank you. I'll raise your comment. Good morning. My name is Glenda Rager. I'm a California deputy attorney general. We represent the Governor's Office of Criminal Justice Planning in this appeal. And if you don't mind, could you speak up just a little bit? I'll try. It's closer. There are two issues in this case, and obviously the Court understands the appellee's office of criminal justice planning position, that there is no evidence in this record that Shirley Wang, Wayne Stumfer, Michael Levy, or Mr. Sawyer had any knowledge of Title VII protected activity. And that's exactly what the Court found. The union grievance process was about union protected activity. There is not one word in those documents about Title VII that, as the district arbitration process. In addition, the Court found that there was no causal link because of the lack of knowledge. But it also found that a plaintiff's own declaration was conclusions, irrelevant, and doesn't support an inference that the defendants knew. And those decisions on the evidentiary findings are subject to an abuse of discretion of the district court. This Court is reviewing the grant of summary judgment de novo, but as to the Court's decisions on the evidentiary objections, those are to be reviewed for an abuse of discretion. And as I said, the trial court did find that Mr. Miller's self-serving declarations were no more than conclusions and speculation. And speculation is particularly important here when we're talking about the job offer, because that very ruling went to arbitration. After the arbitrator ruled that the Mr. Miller should be placed back in or offered the first available position, they went back to the arbitrator on question of whether the February 7, 2003 job offer was bona fide. And the arbitrator found, indeed, it was. What would have been, in follow-up to Judge Kleinfeld's questions, what would the difference have been between long-term employees at the criminal justice planning department and Mr. Miller had he taken the job and, as planned, the office was eliminated? What would his rights have been vis-à-vis the other folks who had not gone through this process but had been permanent employees all along? All right. His rights would have been, depending upon the time he would have accepted the job and when it actually shut down. He may have been a probationary employee. So he would have had to go through probation again. Yes. The arbitrator did find that. But there is no evidence in this record that shows that any person was actually laid off as a result of the OCJP closing. And, in fact, none were. There were jobs and they were all spread around. This is pure speculation, that the folks who offered him the position already knew of the budget cut. There is no proof in the record of that. It's his pure speculation that even if the budget cut were under consideration, that the folks who offered him the job knew it or that, for sure, he would be laid off. And they were offering him the job for that purpose. It's the same causal link problem that he's got in his underlying case, is there is simply no evidence to support it. So when they closed the office, the State didn't save a nickel on personnel, it just put everybody on another budget line? That is my understanding, yes, is that there was not a, from other records, that there were absolutely no layoffs involved in that reorganization, closing that and redistributing folks. And that's what I'm trying to get at here, is that there was no layoffs involved  There is no evidence that there were no layoffs. It's pure speculation that he would have been laid off. Let me ask you this. Because there was, at the time the summary judgment was granted, apparently a stipulation that the complaint could be amended. What in the amended, proposed amended complaint would be new to this lawsuit that Judge Jamrel would not have considered in the summary judgment? Absolutely nothing. It was simply an irrelevant third EEOC charge saying the same thing as the second charge said. The arbitrator told them to put me back to work in the first available position, offer me the first available position, give me back benefits, continue my benefits, pay me back pay and front pay until you offer me that job, pay me interest on that back pay. That's in the second EEOC charge. It's all there. Then he files a third one saying they're still doing it to me because I testified against Ball and Torim. They still haven't given me a job. Well, I understand from the two of the, two of the allegations are, oh, refusal to comply with the arbitrator's award was certainly already in the, in the Federal case. And the argument that the position was to be eliminated and therefore it was really not a good faith effort. But then there was also an allegation about denial of accrued vacation. And it seems, and is that, is that something new that should have been preserved or does it all fall if the Court finds that there was, in fact, no causal link between the decisionmaker's knowledge or the protected activity and the, and the adverse employment action? It all falls. If you look at the second charge, which is on page 53 of the record, it says, with all back pay and benefits. That's vacation pay. Okay. The third charge just uses the term vacation. So this is just simply a, a more specific but repetitive recitation of the relief he was seeking. Yes. From your perspective. Yes. And there's more problems with the stipulation. First of all, the request to amend wasn't before the Court at the time. Plaintiff hadn't said anything about, let us amend. So the Court really didn't have that before them at the time of summary judgment. In addition to that, the stipulation had been filed with the Court in January of 2004, and it was self-executing. It said, we get the right to sue letter. Within 30 days, we automatically can amend. Didn't need a motion to amend. It was automatic. The fact that the plaintiff didn't bother to get the right to sue letter and waited down until he's still at the hearing on summary judgment and then says, wow, I can still get a right to sue letter and start this all over again, it would have been raised judicata barred, had he been allowed to file that complaint because the issues already were decided. And in addition to that, if he didn't have the right to sue letter, the Court didn't have jurisdiction. You have to exhaust and get the right to sue letter before you can file in Federal Court. And then so for those reasons, I think that the Court did not have used its discretion to hear at that late date a motion to amend based on the third PEOC. I don't know if that noise is coming from me. Those are the chimes from Alaska. Oh, I'm sorry. Sorry, my clock was striking. Okay. In any event, I want to revert for just a moment to the arbitration award and plaintiff's arguments regarding. His argument is the arbitrator gave me this award, and they delayed in implementing the arbitrator's award because I gave testimony in 1999 and 2000 in the Ball and Toran matters, which nobody knew, which no one in the decisional process knew. But that's still clearly linking it to the Ball and Toran matters when the arbitrator had retained jurisdiction over the ARB award itself to decide any issues that arose under that. The arbitrator. Counsel, is it correct that if we accept the proposition that there's no genuine issue of fact that all the people involved in the decision had no knowledge that Miller testified in the Ball and Toran matters, the case is over, we don't need to decide anything else? That's correct. That is a necessary element of his proof. He must prove the causal link, and the causal link requires him to show that the decision was based on the facts and not on the conduct. Right. Well, his argument is a little bit different today. His argument is, well, they may or may not have known at that time. He – I think his argument would be, the inference would be that they knew. But they certainly knew about it later on when they made some of these other decisions. How do you respond to that? And there is nothing in the record to prove that either. The point is that we have submitted undisputed facts 53 through 55, which the trial court ruled were not disputed. He specifically said that the plaintiff offered only his declaration, no evidence to contradict the sworn statements of Sawyer, Levy, Wang, and Strumpfer, that they were aware or influenced. And those are the persons who implemented the arbitration award. So the court specifically ruled on the evidentiary objections that even at the time they were implementing the award, they did not know. Are there any other collateral proceedings going on at this point? No. Nothing in the – no pending proceedings for the arbitrator, nothing in EEOC of which you're aware?  That's my – that's to my knowledge. I did check that to see if the arbitration award, all of the facts of the arbitration had been carried out, all of the orders, all of the rulings, and I am informed that they – that it has concluded that all – everything's been paid. I do believe that Mr. Miller is still arguing that he should get both CalPERS and CalSTRS retirement contributions, but there is a specific statute that prohibits. Right. But where is he making that argument? In front of the arbitrator? I believe that that was one of his arguments to the arbitrator, was that he still wanted back pay, and that I have just been informed that he has belatedly made some arguments along that line. They aren't, I believe, in the record. Okay. So there may be something pending in front of the arbitrator is what you're saying  Well, we'll ask him. Yes. I don't know for sure. But I do know that if it is still pending, that was the last remaining thing that I am aware of from the arbitration was whether, because he was working over at the Folsom Unified School District and paying into CalSTRS retirement, whether or not he could also be being paid into CalPERS. And there's a specific statute in the government code, 20,116, I believe. This is not. In any case, that's not in front of us. Right. Yes, Your Honor. But the arbitrator did specifically rule on each of the other issues here that Mr. Miller raises. He says that it wasn't a bona fide position that they offered him on February 7th. Well, the arbitrator ruled on that. Yes, it was. And that ruling is at undisputed facts 37, 46, and 70. There are no, according to the arbitrator, there is no reasonable basis for the appellant to have declined that offer. As a matter of fact, the arbitrator said something to the effect that what you should do is go back to work and then argue the details, but at least you're getting your paycheck. But of course, Mr. Miller didn't want to do that. He was earning more at Folsom Cordova Unified School District than he would have made had he come back as a CGS1. That's in the record. And it's clearly in the record that he thought he was going to get both sets of money, that he was going to he kept arguing, my teaching pay isn't the same as I would have been as a CGS1, so it shouldn't be an offset. I should get both. Are you saying, I didn't realize this, he came out better financially for winding up as a teacher than if he just stayed on his job? Yes. It is because when he got the teaching position, then he was earning more than he was earning as a CGS1. Or at that point in time, if he had accepted the offer, he would have been taking a pay cut. He was earning more as a teacher. But he's saying, well, I wanted to work for the state. Well, the state benefits and the teaching benefits are very similar and is a rather disingenuous argument. It was he who was delaying the arbitration award because he believed he was getting his Folsom Cordova pay and going to get his back pay award. And that is evidenced in the documents attached to the declaration of Roy Chastain, showing the Mr. Miller and the CSEA going back and forth about what he should have and what he shouldn't be awarded under the arbitration award. Most of the declarations that were filed by the decision makers, Levy, Strumper, Wang, Sawyer, indicate that prior to January 2004, in some cases prior to February 2004, they had no knowledge or information that Michael Miller had ever participated in any discrimination or employment-related investigation. And Stumper's is as late as his declaration is as late as October 28, 2004. Were there any decisions, and, of course, this is an 03 case filed in the Eastern District of California. Are there any decisions of which Mr. Miller feels aggrieved that occurred after January or February of 04, to your knowledge? Only that he kept arguing that the job offer wasn't bona fide and they still hadn't put him back to work. And at that point was arguing that these were somehow connected. But, no, the job offer had already been made. The offer to settle had already been made. The ---- I did a timeline, or at least I asked someone in my office to do a timeline, and it ends on September 29, 2003. And I was just wondering if there were any decisions that were made by the State of which Mr. Miller feels aggrieved that would have postdated the declarations of these individuals saying, at least until that time, I didn't know anything about any ball terrain or any other discrimination action that Mr. Miller might have participated in as a witness. No. Again, it was just the continuing they haven't put me back in a bona fide position and speculatively that that would have been eliminated and I'd have lost my job. It was just those kinds of arguments. If the Court has no further questions for me, I'll submit with the request that the Court affirm the trial court on both decisions to grant the summary judgment, affirm grant of summary judgment, and affirm that the summary judgment be granted without further leave to amend. Thank you. Thank you, counsel. Thank you. Thank you. Thank you. For Butler? I wish to address some of those and maybe one comment on page 2, line 25 of the complaint. There were two EEOC complaints made and in the complaint we indicated that there were claims, plural, for the two. Where are you in your complaint? Page 2. Page 2, line 25, 26, filed claims. Because you say that he filed claims. Right. I think my question was, what was the gravamen of your action? And it appears to me in your complaint that the essence of your action is that he was engaged in protected activity in his testimony and that was the form, the basis of the retaliation. That and the retaliation of the events that led up to when the complaint was filed. Where does it say that in the complaint? Well, in the compliance with the procedural requirements, the administrative remedies would be indicating up to that, this timely action. My time is up? No, no. We have a few questions, so go ahead and answer the question. I mean, I think your question is right that, yes, the conduct began with the retaliation, but it didn't stop there, and the complaint certainly doesn't limit it, is what I guess my point is, that it doesn't limit it just to that conduct before either or both of the complaints that are meant to be included in the complaint were included. Let's take up some of the other issues that were raised by the State, kind of in random order, I guess. First, do you agree that your client was making more money as a teacher? No. He was definitely at an economic loss as of this, and many State employees have teaching and other jobs that allow them to do two different types of hours of work because they don't want to work that long. So that's a dispute among the parties at this point. What is the – is there any – are there any – Wait a minute. Wait a minute. On that answer, I didn't understand something. You said two things. You said, no, there was an economic loss, and you said there are many positions where you can do two jobs. Now, on the second part, I don't know if that would be true of jobs that take place during the day, but we'll leave that aside for a moment. It's the first part, no, there was an economic loss. It struck me, when I looked at this guy's claims of economic loss, he was saying, a big part of my economic loss is if I'd been kept on as a CJ1, I would have bought a house, and the house would have gone up in value a whole lot, and I would have made a whole lot of money on the real estate. So that's my economic loss. But you weren't asked about economic loss by Judge Thomas. You were asked about salary. Was the salary as a teacher lower or higher than the salary as a CJ1? That I don't know, honestly, whether it was higher or lower. All I know – So when you said economic loss, you were not answering Judge Thomas's question, which I think was directed to whether his salary was higher as a teacher than it would have been had he been kept on as a CJ1. I understood the question of whether he suffered economic loss. The answer, yes. No, I didn't ask you if he suffered economic loss. I asked you if he was making more. If he was making more, that I don't know. Thank you. I do know that he suffered economic loss, and he certainly suffered his right – And the economic loss was the real estate? In part. That's one component of his damages. The others would be just his right to employment within the state system, and his permanent right as a permanent employee within the state system, attendant to all the benefits. So what level of deference is the arbitrator's finding that the offer to Mr. Miller was, in fact, for a bona fide position entitled here? I don't know that that's binding in this court at all. And I would state that it sounds like they fooled the arbitrator as well at the time that the arbitrator made that type of determination. It was not discovered until after that when Mr. Miller kept pressing and pressing and investigating on his own, as he indicates in his declaration, that the offer was bogus. The state was never forthcoming with a number that is associated with permanent positions. And that kind of continuing conduct existed right up to the filing of the complaint and now this issue of the third EEOC complaint that was pending. And I would disagree that Mr. Miller does not have that right. He does have that right, and I think the district court was committed error in not allowing him when that right-to-sue letter comes down from amending his complaint. But what's new in the third EEOC complaint? In the third EEOC complaint on page 40, excuse me, on page 53, several things are new. One, of course, is this information we now have that the offer and position that was being delayed to him was less than honest. We also have the situation where Jolene Evelyn, a similar situated employee, was allowed to use her vacation and sick leave and other benefits to bridge the gap to something, whereas Mr. Miller was not allowed to use that. And he was not provided his back pays and benefits, and there's been some discussion about CalPERS and STRS and that type of thing and the checks that were written. He didn't get either one. But in both the complaint and Mr. Miller's declaration, which is extensive, doesn't he come to the conclusion that this is all related to the fact that he testified for Ball and Turan and that because of that testimony, the State of California, through its minions, decided that he was dangerous and had to be got rid of and so forth and so on? So if the conclusion is that there's no evidence that the decision-makers knew prior to 2004 of Mr. Miller, doesn't that include all of the various forms of relief that Mr. Miller seeks because he fails to make a prima facie case that there's any discriminatory or retaliatory intent behind the decisions, the follow-up decisions that were made? No. I think, of course, maybe the floodwaters started back there with those Ball and Turan investigation and that. But isn't that what the complaint says? Doesn't the complaint say that my life turned south when I testified for Ball and Turan? I'm entitled. That's protected activity. And for that reason, I need the power of the court to protect me and to tell my employer to stop harassing me or retaliating against me. I mean, isn't that protected activity? And, yes, that would be what we would request the court to do. It's also protected activity to file a grievance in an arbitration proceeding. And that's what we're asking this Court to do. It's also protected activity to file a complaint with the EEOC multiple times, and he should not be retaliated against or, with subterfuge, denied his rights. And so all that continuing conduct and various protected activities and the different But the only thing I think that what concerns me and may concern others on the panel, that the only protected activity that's alleged in your complaint is the testimony on behalf of Ball and Turan. No, I don't think that that's correct, because when the complaint was filed Counsel, let's say you're right, and what he meant in his complaint was all a protected activity of every kind. Why would we care? His federal action for retaliation under Title VII could not include retaliation for organizing other employees. That's an NLRA violation at most, perhaps just California law. And no such law is alleged in the complaint, so I don't know exactly. It was arbitrated as a separate proceeding. Title VII does not prohibit retaliation for union activities. Other law does, but Title VII doesn't. And I don't see where there's anything else before us except retaliation for Title VII activities. Filing a complaint with the EEOC is not a union activity. I get it. And he did that twice. Right. I think Judge Kleinfeld was addressing your argument that there were acts of retaliation based on protected activities, and one of the activities you cited was his union activity, which can't be part of the complaint. You'd agree with that? I would agree with that. Okay. And that's why he went to the arbitration, for the unionizing, for the union activity. But then when he did the other conduct, the EEOC charge of discrimination multiple times, that activity is protected under Title VII and is part of this action and cannot be cast aside. What's left? Are there any collateral proceedings that you're pursuing? To my knowledge, there's nothing left before the arbitration at this time. It hasn't been for some time. Okay. Now, did you have a remedy to appeal from the arbitrator's decision? I don't believe so. I wasn't his counsel to record for that, but I don't believe so. But there is still the pending EEOC administrative action that should be allowed to proceed as well, when and if the EEOC issues its right to sue. I just want to address in closing the comment that counsel made that there's nothing evidence in the record, so it must all fall. That's simply not true. The record is there. The complaints are in the record with the EEOC that he made, and those complaints and those allegations of discrimination do raise tribal issues of fact, and therefore the trial court was amiss in limiting the causal link or anything else to just certain investigation that had happened years before. So it was the floodgates opened and many things happened after that, and that's our position. Thank you very much. Okay. Thank you, counsel. The case just heard will be submitted, and we will be in recess for the morning. All rise. This court for this session stands adjourned. Thank you.
judges: Kleinfeld, Thomas, Leighton